## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

ELSON CASIANO,                     :
                                   :
             Plaintiff             :     No. 3:13-CV-2141
                                   :
      vs.                          :     (Judge Nealon)
                                   :
CAROLYN W. COLVIN, Acting          :
Comissioner of Social Security,    :
                                   :
             Defendant             :

**FILED
SCRANTON
NOV 2 1 2014
PER_____
DEPUTY CLERK**

## <u>MEMORANDUM</u>

On August 13, 2013, Plaintiff, Elson Casiano, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying his application for disability

benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and

XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 401 <u>et</u> <u>seq.</u>, 1381 <u>et</u>

<u>seq.</u> (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth

below, the decision of the Commissioner denying Plaintiff's applications for DIB

and SSI will be vacated.

_____

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not
limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] his application for DIB on November 6, 2009, and his application for SSI on April 5, 2010. (Tr. 18).[4] These claims were initially denied by the Bureau of Disability Determination ("BDD")[5] on July 28, 2010. (Tr. 18). On August 20, 2010, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 18). A hearing was held on April 5, 2012 before administrative law judge Randy Riley ("ALJ"), at which Plaintiff, a vocational expert, Paul Anderson ("VE"), and medical expert, Stuart Gitlow, M.D. ("ME"), testified. (Tr. 18). On April 18, 2012, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff could perform a full range of light work with no overhead reaching, occasional decision-making and changes in routine work setting, no interaction with the public, and occasional interaction with supervisors and coworkers with no tandem tasks. (Tr.

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on November 13, 2013. (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

24-25).

On May 25, 2012, Plaintiff filed a request for review with the Appeals Council. (Tr. 13). On June 18, 2013, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on August 13, 2013. (Doc. 1). On November 13, 2013, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of his complaint on January 16, 2014. (Doc. 13). Defendant filed a brief in opposition on February 20, 2014. (Doc. 14). Plaintiff filed a reply brief on March 4, 2014. (Tr. 15).

Plaintiff was born in the United States on September 9, 1971, and at all times relevant to this matter was considered a "younger individual"[6] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. § 404.1563(c); (Tr. 256).

Plaintiff did not obtain either his high school diploma or GED, and can

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45." 20 C.F.R. §§ 404.1563( c), citing Rule 201.17 in appendix 2.

communicate in English. (Tr. 42, 260, 262). His employment records indicate

that he previously worked as a supervisor at a gas station and a warehouse. (Tr.

286-287). The records of the SSA reveal that Plaintiff had earnings in the years

1987 to 2004. (Tr. 242). His annual earnings range from a low of no earnings in

1991, 1993 and 2003, and from 2005 to 2011, to a high of twenty-nine thousand

eight hundred sixteen dollars and forty-three cents ($29,816.43) in 2000. (Tr.

242).

Plaintiff's alleged disability onset date is December 31, 2002. (Tr. 262).

The impetus for his claimed disability is a combination of mental health

impairments, diabetes, and hypertension. (Tr. 261). In a document entitled

"Function Report - Adult" filed with the SSA in May of 2010, Plaintiff indicated

that he "stayed where he [could]" in terms of living arrangements. (Tr. 200). He

noted that he did not take care of any other people or animals, slept well,

sometimes prepared his own meals, did not do house or yard work, was able to

drive a car and ride a bicycle, could go out alone, and shopped for food, medicine,

and clothes. (Tr. 276-278). Regarding his personal care, he sometimes would go

days without bathing, getting dressed, caring for his hair, shaving, or feeding

himself. (Tr. 276). When asked to check items which his "illnesses, injuries, or

conditions affect," Plaintiff did not check lifting, squatting, bending, standing,

4

reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, or using hands. (Tr. 280).

Regarding his concentration and memory, Plaintiff needed special reminders "some days" to take care of his personal needs and to take his medicine. (Tr. 277). He could count change and pay bills, but did not handle a savings account or use a checkbook because he did not have either one. (Tr. 278). He stated he did not finish what he started "as often as [he felt he] should," and that he did not follow written instructions well, but that he could follow spoken instructions "ok." (Tr. 280).

Socially, Plaintiff watched television and did "not really" spend time with others. (Tr. 279). He reported that he "better not say" whether he had problems getting along with family, friends, neighbors, or others. (Tr. 280). He stated that he did not get along with authority figures, and that he had been fired due to problems getting along with other people. (Tr. 281). He did not handle changes in routine or stress well. (Tr. 281).

At his hearing, Plaintiff alleged that the following combination of physical impairments prevented him from being able to work since December of 2002: past substance abuse, back pain, Antisocial Personality Disorder, Mood Disorder, depression, hypertension, and diabetes. (Tr. 46-48, 53-55). He testified that he

would go weeks when he would shower "fine," but there would also be times during which he would not shower for five (5) to six (6) days in a row. (Tr. 43). He shopped for groceries, cooked his meals, and drove a car. (Tr. 43). His mother did his laundry and cleaned his house. (Tr. 43). Aside from his parents visiting him, he did not see any friends or family because he had "no interest in fun" and the majority of his day was spent sleeping and watching television. (Tr. 44). He testified that he did not drink alcohol or use illegal drugs, that he had been sober for over two (2) to three (3) months, and that his longest period of sobriety was thirteen (13) years. (Tr. 45, 48). He smoked two and a half (2 ½) packs of cigarettes a day. (Tr. 46).

Regarding functional limitations, Plaintiff testified that if he dropped something, he was unable to bend down and pick it up due to back pain. (Tr. 44-45). He had no problems overhead reaching with his left arm, but could only raise his right arm up to chest level. (Tr. 45). He experienced side effects from his medicine, including shortness of breath, a dry cough, and frequent urination. (Tr. 46-47). He also experienced difficulty sitting for too long or standing still due to a diabetic neuropathy. (Tr. 54).

Due to his personality and mood disorders, he had difficulty taking orders from others, had issues with work attendance, had gotten into fights with people

because he could not get along with them, had difficulty controlling his temper, which caused him to be fired from several jobs, experienced mood swings, was easily irritated, experienced paranoia that people were watching him, held onto knives in order to "feel safe," engaged in domestic violence against his wife, and attacked police officers and government property. (Tr. 48-51). He testified that his mental health medications did not fully work, and that he had still experienced anxiety and mood swings. (Tr. 52).

His diabetes was not under control due to medication non-compliance as a result of Plaintiff's forgetfulness. (Tr. 53). He also experienced a neuropathy from his hips down to both legs as a result of his diabetes that made Plaintiff feel like he was "standing on hot charcoal" and that there were "ants [] walking over [his legs]." (Tr. 53). His diabetes also caused blurry vision and memory problems. (Tr. 54).

**MEDICAL RECORDS**

On September 18, 2004, Plaintiff presented to the ER at Pinnacle Health for shortness of breath. (Tr. 421). Plaintiff stated that he felt he was having a reaction to increased psychosocial stressors, and did not want to talk about his drug abuse. (Tr. 422). He was diagnosed with impaired psychosocial coping mechanisms, and was discharged after verbally contracting that he was not suicidal or homicidal.

7

(Tr. 422).

On October 12, 2004, Plaintiff had an appointment at Northwestern Human Services ("NHS"). (Tr. 554). He presented with anxiety, depression, and anger control issues. (Tr. 554). He reported that he was unable to sleep or concentrate, had lost interest in interacting with others, and was frequently agitated, explosive and sad. (Tr. 554). The treatment notes from this visit are largely illegible. (Tr. 554).

On January 3, 2005, Plaintiff had an appointment at NHS. (Tr. 553). Plaintiff reported that he was anxious and depressed, had trouble controlling his emotions, and had been using crack cocaine. (Tr. 553). The treatment notes from this visit are illegible. (Tr. 553).

On January 10, 2005, Plaintiff had an appointment at NHS. (Tr. 552). Plaintiff reported that he continued having difficulty sleeping, mood swings, and agitation. (Tr. 552). His exam noted appropriate grooming, cooperative behavior, normal speech, mood, thought and affect, and no suicidal or homicidal ideations. (Tr. 552). His treatment plan included having a psychiatric evaluation, and addressing his depression. (Tr. 552).

On January 10, 2005, Plaintiff presented to the Edgewater Psychiatric Center for an initial psychiatric evaluation with Edward Coronado, M.D., due to

complaints of suicidal thoughts and drug use. (Tr. 318). The "History of Present Illness" ("HPI") section from this visit stated that Plaintiff was separated from his wife, had four (4) children and a ninth grade education, and was unemployed. (Tr. 318). Plaintiff stated that he had been using drugs for a couple of months on a daily basis and drank alcohol episodically, but stopped sniffing cocaine before September of 2004. (Tr. 318). He had previously been incarcerated for cocaine possession in the 1980s, and he was on probation for two (2) years at the time of the appointment for theft. (Tr. 318). He reported having a depressed mood and mood swings that caused difficulty falling asleep and getting out of bed, a lack of appetite, and suicidal thoughts, but he denied feeling hopeless, helpless, or worthless, having suicidal plans, manic symptoms, hallucinatory experiences, or any delusions. (Tr. 318). He had been attending psychotherapy sessions for "some time." (Tr. 318). Plaintiff's exam noted that his speech was coherent, his eye contact was good, his appearance was clean and groomed, his mood was cooperative and pleasant, his affect was blunted, his thoughts were coherent and goal-directed, his thought content lacked hallucinations and delusions, his immediate and remote memory were intact, he was oriented to time and place, and his fund of knowledge was normal. (Tr. 320). His Axis I diagnostic impression

was depression and cocaine use, and his Global Functioning Assessment ("GAF")[7]

---

7.    The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. See Am. Psychiatric Assoc., Diagnostic and Statistic Manual of Mental Disorders 4d (2000). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. Id. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. Id.

However, the American Psychiatric Association no longer uses the GAF score for assessment of mental disorders due to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed. Solock v. Astrue, 2014 U.S. Dist. LEXIS 81809, *14-16 (M.D. Pa. June 17, 2014) (citing Ladd v. Astrue, 2014 U.S. Dist. LEXIS 67781 (E.D. Pa. May 16, 2014)); See Am. Psychiatric Assoc., Diagnostic and Statistic Manual of Mental Disorders 5d, 16 (2013). As a result, the SSA permits ALJs to use the GAF score as opinion evidence when analyzing disability claims involving mental disorders; however, a "GAF score is never dispositive of impairment severity," and the ALJ, therefore, should not "give controlling weight to a GAF from a treating source unless it is

was a sixty (60). (Tr. 320). Dr. Coronado prescribed Wellbutrin for depression, advised that Plaintiff continue with psychotherapy and attend drug treatment group sessions, and scheduled a follow-up for two (2) weeks. (Tr. 321).

On January 17, 2005, Plaintiff presented to the ER at Pinnacle Health for back pain that began after carrying a heavy box. (Tr. 417). Plaintiff was diagnosed with a low back strain and sprain, and was prescribed Ultram. (Tr. 418).

On January 24, 2005, Plaintiff had an appointment at NHS. (Tr. 551). He reported that he was experiencing mood swings, depression, anxiety, and difficulty with relationships. (Tr. 551). His exam revealed appropriate grooming, cooperative behavior, normal speech, mood, thought, and affect, and no suicidal or homicidal ideations. (Tr. 551). His treatment plan included continuing individual therapy. (Tr. 551).

On January 24, 2005, Plaintiff had another appointment with Dr. Coronado. (Tr. 316). Plaintiff was described as having a clean appearance, a blunted affect, a depressed mood, a normal appetite, insomnia, and a normal speech and thought pattern, and was compliant with his medicine. (Tr. 316). Dr. Coronado increased

---

well[-]supported and not inconsistent with other evidence." SSA AM-13066 at 5 (July 13, 2013).

Plaintiff's Wellbutrin prescription. (Tr. 316).

On January 31, 2005, Plaintiff had an appointment at NHS. (Tr. 550). Plaintiff reported that his sleep had improved, and he denied depressed feelings. (Tr. 550). His exam revealed appropriate grooming, cooperative behavior, normal speech, mood, thought, and affect, and no suicidal or homicidal ideations. (Tr. 550).

On March 1, 2005, Plaintiff presented to the ER at Pinnacle Health for syncope. (Tr. 414). He denied that he had been using cocaine, and stated that he had not used it for years, but his urine tested positive for cocaine. (Tr. 415). His diagnoses included resolved syncope and diplopia, hypertension, and illicit drug use. (Tr. 416).

On March 14, 2005, NHS issued a Discharge Summary for Plaintiff due to no-shows and treatment non-compliance. (Tr. 549).

On April 15, 2005, Plaintiff had an appointment with Dr. Coronado. (Tr. 315). Plaintiff reported that he remained sober from cocaine use, had been attending drug treatment sessions twice a week, that he had a short temper, and that he had not run out of his medicine since his last appointment in January of 2005. (Tr. 315). Plaintiff's appetite was normal, he was compliant with his medicine, his appearance was clean, his behavior was cooperative, his mood was

12

depressed, his affect was blunted, and his speech and thought pattern were normal. (Tr. 315). Dr. Coronado increased Plaintiff's Wellbutrin dose. (Tr. 315).

On November 22, 2005, Dr. Coronado's office closed Plaintiff's file because of his non-compliance with treatment and failure to attend any appointments outside of the initial assessment. (Tr. 313). Plaintiff's GAF upon the file closing was fifty-five (55). (Tr. 313).

On December 16, 2005, Plaintiff had a psychotherapy appointment at Philhaven. (Tr. 535). He expressed that talking about his problems helped him to feel less overwhelmed. (Tr. 535). His listed problem was depression, and his goals included working on getting his GED, developing a support system with his family, and working on his communication skills. (Tr. 535).

On December 22, 2005, Plaintiff underwent a psychiatric evaluation at Philhaven performed by Jenny Owens, M.D. (Tr. 531). Plaintiff noted that he stayed inside, and felt sad, irritable, and angry, which caused crying spells. (Tr. 531). He reported having a decreased appetite with associated weight loss, difficulty falling and staying asleep, decreased energy and motivation, and that he did not want to live anymore, but that he had no suicidal plans. (Tr. 531). He had been clean from crack cocaine for twelve (12) years, but had recently begun using cocaine again several times a month. (Tr. 531). Plaintiff's exam revealed that he

was pleasant, cooperative, had good eye contact, was well-groomed, had a logical and goal-directed thought process, had normal speech and motor activity, had grossly intact cognition, had fair insight and judgment, and did not have delusions, hallucinations, or suicidal ideations. (Tr. 532). His Axis I diagnostic impression included cocaine abuse, history of alcohol dependence, and recurrent, severe Major Depressive Disorder. (Tr. 532). His Axis IV diagnostic impression included moderate psychosocial and environmental problems, and his GAF was a forty (40). (Tr. 533). Plaintiff was prescribed Prozac and Klonopin, and was encouraged to follow-up in four (4) weeks. (Tr. 533).

On January 20, 2006, Plaintiff was discharged from outpatient care with Philhaven. (Tr. 537). His Axis I impressions included Cocaine-induced Anxiety Disorder, recurrent, moderate Major Depressive Disorder, Cocaine Abuse, Alcohol Abuse, and Bipolar Disorder. (Tr. 537). He was discharged after failing to attend therapy sessions, and it was noted that Plaintiff was only marginally open to treatment in participation and recovery due to his current substance abuse. (Tr. 537).

On August 8, 2008, Plaintiff presented to the ER at Pinnacle Health for back pain that began after tripping on a cat while carrying a television. (Tr. 408). His diagnosis was " back pain, post fall," and Plaintiff was prescribed Motrin. (Tr.

409).

On March 23, 2009, Plaintiff presented to the ER at Pinnacle Health for neck pain. (Tr. 404). He was diagnosed with musculoskeletal neck pain, and was instructed to take Motrin and utilize heat throughout the day and night. (Tr. 404).

From July 12, 2009 to July 14, 2009, Plaintiff was hospitalized at Holy Spirit Hospital ("HSH") in Harrisburg, Pennsylvania due to an overdose of cocaine, narcotic pain pills, and alcohol after he saw pictures of his children whom he had not seen for four (4) years. (Tr. 323). He then voluntarily checked into HSH's inpatient psychiatric unit from July 14, 2009 to July 17, 2009, under the care of Robin Miller, M.D. (Tr. 323-324). Upon his arrival at the inpatient unit, Plaintiff stated that he was severely depressed the day prior, but that he denied significant depression currently, and his sleep and energy level were good and his appetite was fair. (Tr. 323). He admitted that he felt paranoid, especially after coming down from a drug high. (Tr. 323). His exam revealed that he was awake and alert, his mood and affect were calm and stable, his thoughts were goal-directed, he was oriented in all spheres, his insight and judgment were fair, his intelligence was average, he was not experiencing thoughts of harming himself or others, and he did not appear to be overly psychotic. (Tr. 324). His Axis I impression was Major Depressive Disorder, that was recurrent and severe without

psychotic features, and cocaine and alcohol abuse, his Axis II impression was

Antisocial Personality Disorder, his Axis III impression was diabetes, and his

GAF was a twenty-five (25) to thirty (30), with his highest GAF over the past year

being a forty (40) to a forty-five (45). (Tr. 324). Plaintiff's treatment plan

involved anti-depressants and drug and alcohol rehabilitation as well as individual

psychotherapy sessions. (Tr. 324). His prescribed medications included Celexa,

Clonidine, Lisinopril, Metformin, Depakote, Risperdal, and Trazodone. (Tr. 328).

On July 17, 2009, Plaintiff was admitted to Roxbury Treatment Center for

inpatient drug and alcohol rehabilitation. (Tr. 332). Plaintiff denied having any

current suicidal or homicidal ideations, hallucinations or delusions, and admitted

to a history of suicidal ideation and behavior. (Tr. 332). He admitted to drinking

three (3) to six (6) beers daily after work, with his last alcoholic drink on July 11,

2009 that included six (6) shots and twelve (12) beers. (Tr. 334). He admitted to

using both cocaine and crack cocaine for the seven (7) years prior and as recently

as July 11, 2009. (Tr. 334). He denied any other substance and illegal drug use.

(Tr. 334). His exam noted that his appearance was neat, his speech was normal,

his mood and affect were labile, and his judgment and insight were fair. (Tr. 335-

336). His Axis I impression included drug and alcohol dependence, Bipolar

Disorder, and Major Depressive Disorder that was recurrent, his Axis II

16

impression included Antisocial Personality Disorder, his Axis III impression included hypertension and diabetes, and his GAF was a thirty-five (35). (Tr. 336).

In the Nursing Assessment completed on July 17, 2009, it was noted that Plaintiff was ambulatory and oriented to all spheres, and that he had been experiencing chest pain, palpitations, irregular heart beat, hypertension, shortness of breath, a cough, dizziness, headaches, chronic pain in his neck and lower back, and problems with his vision, hearing, and sleep. (Tr. 342-343). His medical diagnoses included hypertension and diabetes. (Tr. 344). In the Social Work section of his exam, Plaintiff stated that he felt hopeless of "everything about [his] life," that he would yell and cry when angry and sad, that he did not feel accepted by others, that he felt he was a kind, caring, helpful person, that he really did not care about himself, that he used crack cocaine every day, and that he had difficulty reading and writing. (Tr. 344-346). His criminal convictions were noted to include hit-and-run, drug possession charges, disorderly conduct, malicious destruction, and theft. (Tr. 347).

In the intake questionnaire completed on July 20, 2009, for Roxbury Treatment Center, Plaintiff reported that he had not been showering, that he had lost interest in activities, that he experienced social withdrawal everyday, that he was unable to parent his children since 2003, that he was irritable and had poor

17

impulse control with both himself and others, that he had difficulty sleeping more than three (3) hours a night, that he engaged in binge eating and would then go two (2) to three (3) days without eating, and that he had experienced a fifty (50) to sixty (60) pound weight loss. (Tr. 336-337). He admitted to having panic attacks and paranoid thoughts that people were talking about him. (Tr. 338). Plaintiff stated that he was homeless at the time of his intake, and that he did not have any friends or supportive people in his life. (Tr. 339). His psychiatric treatment history included four (4) inpatient hospitalizations between the ages of fifteen (15) to twenty-one (21). (Tr. 338). Plaintiff's treatment plan included making sure he understood the dual drug and alcohol disorders, steps one (1) and two (2) of recovery, and relapse prevention methods. (Tr. 349).

A psychiatric evaluation was performed on July 20, 2009 at Roxbury. (Tr. 354). Plaintiff stated he had dreams of killing his mother, and also of killing himself by "jumping off [the] sink to see [the] shower rod coming out [the] back of his neck." (Tr. 354). He admitted that he had stolen from others, and killed dogs and cats "to see them die." (Tr. 354). He admitted to crack cocaine, alcohol, and heroin use, but "never got a hold of crystal meth." (Tr. 354). His exam revealed that his appearance was good, his motor activity, orientation, and speech were normal, his mood was depressed, his affect was flat, and his capacity for activities

of daily living was good. (Tr. 355). He denied any hallucinations, delusions, or compulsions. (Tr. 355). His Axis I impression included cocaine dependence, Intermittent Explosive Disorder, and Psychosis, his Axis II impression included "cluster B traits," and his GAF was thirty-eight (38). (Tr. 356). His treatment plan included Celexa, Depakote, Trazodone, and Seroquel. (Tr. 356).

On July 22, 2009, Plaintiff underwent an examination while in inpatient rehab at Roxbury. (Tr. 350). His active medical problems included blurry vision, hypertension, diabetes, and degenerative joint disease ("DJD"). (Tr. 350). Plaintiff reported that he smoked cigarettes for twenty-five (25) years, and had used crack cocaine, heroin and opiates. (Tr. 350). His exam was normal. (Tr. 350-352). His Axis I impression included polysubstance dependence and abuse, and his Axis II impression included hypertension, diabetes, vertigo, and tinnitus. (Tr. 353).

From August 11, 2009, to September 10, 2009, Plaintiff underwent treatment at Fairmont Behavioral Health System for drug and alcohol dependence. (Tr. 357- 396). While the treatment notes from these visits are largely illegible, Plaintiff's Axis I impression included cocaine and heroin dependency and Antisocial Personality Disorder, his Axis II impression included depression, his Axis III impression included hypertension, diabetes, and DJD, his GAF upon

arrival was a forty-five (45) and his GAF upon discharge was a fifty (50). (Tr. 357).

On September 25, 2009, after examining Plaintiff, Dr. Baughman declared Plaintiff to be permanently disabled due to bipolar disorder, diabetes, hypertension, and depression based on physical exams, a review of the records, Plaintiff's clinical history, and appropriate diagnostic procedures. (Tr. 451).

On October 23, 2009, Plaintiff had an appointment with Dr. Baughman. (Tr. 444). His blood pressure was elevated and his blood glucose was high. (Tr. 444). The diagnostic impression included diabetes, hypertension, neuropathy, headaches, and chronic pain. (Tr. 444). Plaintiff was prescribed Norvase, Bystolic, and several other medications. (Tr. 444-445).

On March 31, 2010, Plaintiff presented to the ER at Pinnacle Health complaining of high blood sugar and a sore throat. (Tr. 399). Plaintiff was diagnosed with poorly-controlled diabetes and acute pharyngitis. (Tr. 400). Plaintiff was instructed to watch his diet, replace his broken glucometer, and monitor his blood sugar. (Tr. 400). He was also instructed to continue his blood pressure medication and initiate Actos. (Tr. 400).

On April 16, 2010, Plaintiff had an appointment with Dr. Baughman for blurry vision. (Tr. 437). He was diagnosed with decreased vision, hypertension,

and hyperglycemia. (Tr. 437). Dr. Baughman prescribed Glipizide and Levemir for Plaintiff. (Tr. 438).

On May 4, 2010, Plaintiff had an appointment with Dr. Baughman for neck pain. (Tr. 435). Plaintiff's neck was swollen and bruised and was painful to the touch. (Tr. 435). His exam was positive for fatigue, hypertension, DJD, anxiety, depression, bipolar disorder, diabetes, pain, and neuropathy. (Tr. 435). Plaintiff was diagnosed with neck pain, hypertension, petichial rash, and eczema. (Tr. 435). Dr. Baughman ordered an ultrasound of the soft tissues of the neck. (Tr. 436).

On May 7, 2010, Plaintiff had an appointment with Paul Baughman, M.D. for insomnia and high blood pressure. (Tr. 433). His exam was positive for fatigue, anxiety, depression, diabetes, bipolar disorder, insomnia, pain, DJD, hypertension, and neuropathy. (Tr. 433). He was diagnosed with hypertension, and it was noted that his neck pain had improved. (Tr. 433).

On July 19, 2010, John Hower, Ph.D. performed a Psychiatric Review Technique for the present time. (Tr. 488). In this review, Dr. Hower found insufficient evidence to support a mental health impairment. (Tr. 488). Dr. Hower also performed a Psychiatric Review Technique on July 20, 2010 for Plaintiff from Plaintiff's date of last insured to December 31, 2007. (Tr. 501). He found

21

insufficient evidence to support a mental health impairment. (Tr. 501).

On July 18, 2011, Ralph Picciotto, M.D., performed a consultative examination of Plaintiff. (Tr. 524). Plaintiff told Dr. Picciotto that he was depressed and irritable all the time, could not seem to manage to function when he was working, was having difficulty sleeping, had anxiety, and sometimes heard voices and hallucinated. (Tr. 525). He last used crack cocaine two (2) months prior to the exam. (Tr. 525). His medications list included Depakote, Klonopin, and other mood stabilizers and anti-depressants. (Tr. 525). Plaintiff's exam revealed that he was well-developed, well-nourished, pleasant, polite, cooperative, had a depressed mood and constricted affect, had occasional auditory and visual hallucinations, was oriented to all spheres, had good long and short term memory and concentration, and denied suicidal and homicidal thoughts. (Tr. 526). Dr. Picciotto's impression was that Plaintiff had recurrent Major Depressive Disorder with psychotic features, and crack cocaine dependence that was currently in "fair remission." (Tr. 527). Dr. Picciotto concluded that Plaintiff had slight impairments with understanding and remembering detailed instructions and interacting appropriately with co-workers and supervisors, and a moderate impairment of responding appropriately to work pressures in a usual work setting. (Tr. 529). Dr. Picciotto stated that alcohol and/ or substance abuse had not

currently contributed to Plaintiff's impairments. (Tr. 530).

On September 15, 2011, Plaintiff had a psychiatric evaluation at NHS performed by Soroush Noori, M.D. (Tr. 565). Plaintiff reported that he was homeless, stressed out, slept during the daytime, was up at nighttime, was isolating himself, and was using drugs "a lot." (Tr. 565). He stated that a therapist that he was seeing at Mazzitti and Sullivan for drug and alcohol rehabilitation told him to go to NHS for therapy. (Tr. 565). He stated that he felt angry all the time, and had "drug dreams" thirteen (13) to fourteen (14) times a month that caused an urge to use drugs. (Tr. 565). He stated that he had been using an excessive amount of cocaine that caused paranoia, and also had been abusing alcohol. (Tr. 565). His diabetes was not under control, and he was not sure whether his blood pressure was stable. (Tr. 566). He denied any suicidal or homicidal ideations, but was "tired of feeling that people [were] dictating to him what to do and what not to do," which is why he did not want to do any inpatient therapy. (Tr. 566). His medication list at this appointment included Lisinopril and Metformin. (Tr. 566). He reported that he stopped taking his psychiatric medications a few months prior to the appointment, and believed that these medications did not help him. (Tr. 566). Dr. Noori stated that Plaintiff was jittery, maintained good eye contact, had tremors, was polite and communicative, was oriented to time, place, and person,

23

had mood swings that were much more out of control when using drugs, denied suicidal or homicidal ideations, continued to have anger that made him preoccupied with fighting, and admitted to auditory and visual hallucinations when intoxicated. (Tr. 567). Plaintiff's insight into his problem was very poor, his judgment extremely poor, and his general knowledge was below average. (Tr. 567). Plaintiff was also noted to be uncooperative and irritable, he refused to go to any facility to help with his severe drug and alcohol abuse, and he just wanted medication to make his anger "go away." (Tr. 568). His Axis I impression was polysubstance dependence and abuse, his Axis II impression was Antisocial Personality Disorder, his Axis III impression included diabetes, hypertension, and high cholesterol, and his GAF was forty-five (45). (Tr. 568). Dr. Noori's recommendations were for Plaintiff to enter an inpatient or outpatient rehabilitation, and he was prescribed Celexa. (Tr. 568).

On October 20, 2011, Plaintiff presented to the ER at Pinnacle Health for diabetic complications as a result of not taking his insulin for five (5) days and not checking his blood sugar. (Tr. 590). Plaintiff's diagnoses included hypertension, hyperglycemia, and peripheral neuropathy, and he was discharged with instructions to follow-up with Dr. Baughman. (Tr. 594).

On October 27, 2011, Plaintiff had an appointment at NHS. (Tr. 564). The

notes from this visit are largely illegible.  (Tr. 564).

On October 28, 2011, Plaintiff presented to the ER at Pinnacle Health for shoulder pain after falling from a ladder while cleaning his gutters.  (Tr. 584).  His final diagnoses were a bilateral rotator cuff tear and injury to his right shoulder.  (Tr. 587).  Plaintiff was discharged, and instructed to follow up with Dr. Baughman.  (Tr. 587).

On December 22, 2011, Plaintiff had an appointment at NHS.  (Tr. 563).  The notes from this visit are largely illegible.  (Tr. 563).  Plaintiff's Axis I impression included polysubstance dependence and abuse, Major Depressive Disorder, and Antisocial Personality Disorder.  (Tr. 564).

On December 29, 2011, Plaintiff was discharged from outpatient care at NHS.  (Tr. 559).  Upon discharge, his Axis I impression was Major Depressive Disorder and polysubstance dependence, his Axis II impression was Antisocial Personality Disorder, his Axis III impression was diabetes, hypertension, and high cholesterol, and his GAF was fifty (50).  (Tr. 559).

On February 8, 2012, Plaintiff had an appointment with Dr. Wiswesser at NHS Capital Region Outpatient Facility for an initial therapy treatment plan.  (Tr. 569).  Plaintiff's presenting problems included depression, anger, panic attacks, and a history of drug and alcohol abuse, suicide attempts, self-harm, and trauma at

the hands of police.  (Tr. 569).  His Axis I impression was polysubstance

dependence and abuse, Hallucinogen persistent- Preceptual Disorder, and Major

Depressive Disorder with psychotic features, and his GAF was forty-two (42).

(Tr. 569).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07. Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive DIB and SSI, the plaintiff must demonstrate he/she is "unable to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905 (defining disability).

Further,

> an individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether

a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe[8] or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the RFC to return to his or her past work and (5) if not, whether he or she can adjust to other work in the national economy. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004). "At step five, the

---

8. An impairment is severe if it significantly limits an individual's physical or mental ability to do basic work activities. 20 C.F.R. § 416.920. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921.

burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and [RFC]. " Id.

As part of step four, when a claimant's impairment does not meet or equal a listed impairment, the Commissioner will assess the RFC. See 20 C.F.R. § 416.920. RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The RFC assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'[RFC]' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

Using the RFC assessment, the Commissioner will determine whether the claimant can still perform past relevant work, or can make an adjustment to other work. Id. If so, the claimant is not disabled; and if not, he is disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos

v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007) (citing Ramirez v.

Barnhart, 372 F.3d 546, 550 (3d Cir. 2004)).  "At step five, the burden of proof

shifts to the Social Security Administration to show that the claimant is capable of

performing other jobs existing in significant numbers in the national economy,

considering the claimant's age, education, work experience, and [RFC]. " Id.

## ALJ DECISION

Initially, the ALJ found that Plaintiff met the insured status requirements of

the Social Security Act through December 31, 2007.  (Tr. 20).  At step one, the

ALJ found that Plaintiff had not engaged in substantial gainful work activity from

his onset date of December 31, 2002.  (Tr. 20).

At step two, the ALJ determined that Plaintiff suffered from the severe

impairment of a "right shoulder injury (20 C.F.R. 404.1520(c) and 416.920(c))."

(Tr. 20).

At step three of the sequential evaluation process, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925

and 416.926).  (Tr. 25).

At step four, the ALJ determined that Plaintiff had RFC to perform light

31

work as defined in 20 CFR § 404.1567(b) and 416.967(b) with the following

limitations:

> [Plaintiff] is prohibited from overhead reaching. [Plaintiff] is
> capable of working in a low stress job as defined by occasional
> decision making and changes in the routine work setting, no
> interaction with the public and occasional interaction with
> supervisors and coworkers with no tandem tasks.

(Tr. 25-26).  In consideration of Plaintiff's RFC, the ALJ determined Plaintiff was

unable to perform any past relevant work.  (Tr. 28).

At step five, the ALJ found that given Plaintiff's age, education, work

experience, and RFC, there were jobs that existed "in significant numbers in the

national economy that Plaintiff could perform (20 C.F.R. 404.1569, 404.1569(a),

416.969, and 416.969(a))."  (Tr. 29).

The ALJ concluded that Plaintiff was not under a disability as defined in the

Social Security Act at any time between the onset date of December 31, 2002, and

the date of the ALJ's decision.  (Tr. 29).

## DISCUSSION

On appeal, Plaintiff challenges the ALJ's decision on the following

grounds: (1) the ALJ did not acknowledge and evaluate all medical impairments

established by the record; (2) the ALJ erred in granting great weight to Dr.

Gitlow's opinion; and (3) the ALJ did not properly determine Plaintiff's physical

RFC. (Doc. 13, p. 8).   Defendant disputes these contentions. (Doc. 14, pp. 12-24).

Plaintiff argues that the ALJ erred in failing to acknowledge and evaluate Plaintiff's medically determinable impairment of Antisocial Personality Disorder. (Doc. 13, pp. 9-13).   Plaintiff asserts that the ALJ erred in mentioning only two (2) medically determinable mental health impairments, including substance abuse and mood disorder, because the record supports that Plaintiff had the medically determinable health impairment of Antisocial Personality Disorder that the ALJ therefore had a duty to discuss. (Id.).   Furthermore, Plaintiff contends that the ALJ's omission in discussing this impairment was not harmless error because this lack of discussion rendered all the other steps in the sequential evaluation process as defective. (Id. at 10-11).   Plaintiff argues, "[t]his Court can only speculate how the ALJ would have considered [Plaintiff's] Antisocial Personality impairment if the ALJ recognized it existed." (Id. at 11).

The ALJ has the duty to mention all medically determinable impairments at step two, regardless of whether the ALJ determines these impairments to be severe or non-severe, and the ALJ's failure to do so renders his determination defective. See Shedden v. Astrue, 2012 U.S. Dist. LEXIS 30467, *37 (M.D. Pa. Mar. 7, 2012) (Rambo, J.) (holding "[a] failure to find a medical condition severe at step

two will not render a decision defective if some other medical condition was found severe at step two. However, all of the medically determinable impairments both severe and non-severe must be considered at step two and then at step four when setting the [RFC]").

Furthermore, an ALJ's failure to mention all medically determinable impairments renders the ALJ's RFC determination at step four as defective. See Little v. Astrue, 2011 U.S. Dist. LEXIS 150308 (M.D. Pa. Sept. 14, 2011) (Kosik, J.) ("In this case, the record suggests that [the plaintiff] suffered from a low back condition that caused pain. The failure of the [ALJ] to find that condition as a medically determinable impairment, or to give an adequate explanation for discounting it, makes his decision at step four of the sequential evaluation process defective."); Crayton v. Astrue, 2011 U.S. Dist. LEXIS 110315, *15 (M.D. Pa. May 18, 2011) (Muir, J.) ("The failure of the [ALJ] to find the above noted conditions as medically determinable impairments, or to give an adequate explanation for discounting them, makes the subsequent steps of the sequential evaluation process defective.").

In the case at hand, the ALJ failed to acknowledge or discuss why it was discounting Plaintiff's Antisocial Personality Disorder as a medically determinable impairment. (Tr. 20-25). However, upon review of the record, it is determined

34

that the objective medical evidence supports that Plaintiff's Antisocial Personality Disorder was a medically determinable impairment as it was diagnosed and discussed by five (5) different medical professionals, including Dr. Miller and Dr. Noori.  (Tr. 324, 336, 357, 559, 564, 568).  Therefore, Plaintiff is correct that the ALJ had the duty to acknowledge or explain why he was discounting Plaintiff's Antisocial Personality Disorder as it was a medically determinable impairment. Consequently, the ALJ's decision was defective at step two, and it is therefore not necessary for this Court to address Plaintiff's remaining arguments.  As such, substantial evidence does not support the ALJ's step two findings or the remainder of the decision, and remand is warranted.

## CONCLUSION

The Court's review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), Plaintiff's appeal will be granted, the decision of the Commissioner will be vacated, and the case will be remanded to the Commissioner for further proceedings.

A separate Order will be issued.

**Date**: November 21, 2014

United States District Judge